754 S.E.2d 885

**Morris Antonio SULLIVAN, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

Appellate Case No. 2010–151951.

No. 5190.

Court of Appeals of South Carolina.

Heard Nov. 5, 2013.
Decided Jan. 29, 2014.
Rehearing Denied March 20, 2014.

242

Deputy Chief Appellate Defender Wanda H. Carter, of Columbia, for Petitioner.

Assistant Attorney General Karen Christine Ratigan, of Columbia, for Respondent.

FEW, C.J.

Morris Antonio Sullivan shot and killed Jervis Powers, and a jury convicted Sullivan of voluntary manslaughter, possession of a weapon during the commission of a violent crime, and possession of a pistol under the age of twenty-one. Sullivan filed an application for post-conviction relief (PCR) alleging his trial counsel was ineffective for not making a sufficient request to the trial court to include language from *State v. Burriss*, 334 S.C. 256, 513 S.E.2d 104 (1999), in its jury charge on involuntary manslaughter. Because there is no evidence that Sullivan shot Powers unintentionally, we find Sullivan was not entitled to an involuntary manslaughter charge, and thus was not prejudiced by any alleged error of his trial counsel. We affirm.

## I. Facts and Procedural History

On the afternoon of January 16, 1998, Sullivan fired three shots in Powers' direction after the two exchanged angry words. According to eyewitness testimony, Sullivan and Powers began arguing over whether Sullivan fired gunshots into Powers' home earlier that day. After Powers took his jacket off like "he was ready to fight," Sullivan walked down the hallway to the back bedroom. Powers followed Sullivan, and they were still arguing when they entered the bedroom. A few minutes later, Sullivan entered the living room, holding a gun and walking backwards away from Powers, while Powers advanced towards Sullivan. Sullivan told Powers to "get out of here," but Powers said, "I don't give a f*** about that gun" and that "if [Sullivan] had the gun out he better use it." Sullivan then fired a "warning shot" into the floor. Powers "kept walking toward [Sullivan], so he shot again" in a downward direction, hitting Powers in the leg. Powers "continued to walk toward [Sullivan]," and Sullivan fired a third shot that hit Powers in the chest. According to one witness, Powers "was falling over holding his leg" when Sullivan fired the third shot.

The State introduced notes an officer took during Sullivan's interview with police. According to the notes, Sullivan asked Powers to come with him to the back bedroom to settle their dispute "man to man." Once there, Powers pushed Sullivan. Sullivan then reached for his gun and "asked [Powers] to please leave several times." Powers responded, "I'm not afraid to die," and walked toward Sullivan. Sullivan then "shot in the floor to scare [Powers]," and shot two more times.

The State also introduced Sullivan's written statement to police, in which he stated Powers followed him to the back bedroom, where they continued to argue. He then told police,

> [W]e both grabbed for the gun, but I got it and went back toward the front [of the house], ... and I kept asking him to leave. And then he replied that he isn't scared to die, and then I shot him—I shot down once and then I shot two more times. Then I saw him fall.

The court charged the jury on murder, voluntary manslaughter, involuntary manslaughter, self-defense, defense of habitation, and necessity. However, when the court charged

the jury on involuntary manslaughter, it did not include language explaining that a person can be acting lawfully if he is entitled to arm himself in self-defense at the time of the shooting. *See Burriss*, 334 S.C. at 262, 513 S.E.2d at 108 ("[A] person can be acting lawfully, even if he is in unlawful possession of a weapon, if he was entitled to arm himself in self-defense at the time of the shooting."). The jury found Sullivan guilty of voluntary manslaughter and the two weapons charges, and the trial court sentenced him to eighteen years in prison.

After this court dismissed his direct appeal pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), *see State v. Sullivan*, Op. No. 2008–UP–478 (S.C. Ct.App. filed Aug. 11, 2008), Sullivan filed this PCR action. He claimed his trial counsel was ineffective for not sufficiently requesting an involuntary manslaughter charge that included the language from *Burriss*. The PCR court dismissed the application, finding Sullivan failed to prove either prong of the test from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

## II. No Evidence of Unintentional Killing

▇▇▇ This court will affirm if there is any evidence to support the PCR court's ruling. *Moore v. State*, 399 S.C. 641, 646, 732 S.E.2d 871, 873 (2012). We find there is evidence to support the PCR court's finding under the second prong of *Strickland*—that Sullivan was not prejudiced by any alleged error of trial counsel—because Sullivan was not entitled to an involuntary manslaughter charge in the first place. *See Harris v. State*, 354 S.C. 382, 389, 581 S.E.2d 154, 157 (2003) (finding defendant not prejudiced by counsel's failure to request an involuntary manslaughter charge where evidence did not warrant such a charge).

▇▇▇ Involuntary manslaughter is defined as the unintentional killing of another without malice while engaged in (1) an unlawful activity not naturally tending to cause death or great bodily harm or (2) a lawful activity with reckless disregard for the safety of others. *State v. Smith*, 391 S.C. 408, 414, 706 S.E.2d 12, 15 (2011). To warrant a jury charge on involuntary manslaughter under either definition, there must be some

evidence that the killing was unintentional. *See Douglas v. State,* 332 S.C. 67, 74, 504 S.E.2d 307, 310 (1998) (stating "involuntary manslaughter is at its core an unintentional killing"); *State v. Gibson,* 390 S.C. 347, 357, 701 S.E.2d 766, 771 (Ct.App.2010) (stating "the essence of involuntary manslaughter is the involuntary nature of the killing").

■ Sullivan asserts he was prejudiced because there is evidence to support that he fired the gun while lawfully armed in self-defense. However, whether he was engaged in a lawful activity is of no consequence if he intentionally fired the gun. When the victim was killed by a gunshot, and no evidence is presented showing the defendant fired the gun unintentionally, the defendant is not entitled to a charge of involuntary manslaughter. *See Douglas,* 332 S.C. at 74–75, 504 S.E.2d at 310–11 (holding involuntary manslaughter charge not warranted when defendant admitted he intentionally fired his gun in self-defense); *State v. Pickens,* 320 S.C. 528, 531–32, 466 S.E.2d 364, 366–67 (1996) (holding defendant who admitted intentionally shooting the gun was not entitled to involuntary manslaughter charge); *State v. Cooney,* 320 S.C. 107, 112, 463 S.E.2d 597, 600 (1995) (holding defendant not entitled to involuntary manslaughter charge when he intentionally shot towards the ground at the victim's feet); *Bozeman v. State,* 307 S.C. 172, 177, 414 S.E.2d 144, 147 (1992) (explaining involuntary manslaughter charge inappropriate when defendant "only meant to shoot over the victim's head" because he intended to shoot the gun); *Gibson,* 390 S.C. at 357–58, 701 S.E.2d at 771–72 (holding defendant not entitled to involuntary manslaughter charge where defendant intentionally fired the gun); *State v. Morris,* 307 S.C. 480, 484, 415 S.E.2d 819, 821–22 (Ct.App.1991) (holding defendant who intentionally fired the gun not entitled to an involuntary manslaughter charge).

The record demonstrates conclusively that Sullivan intentionally fired the gun three times, and we find no evidence to the contrary. The fact that all three shots were fired downward in an attempt to scare Powers does not change the fact that the shots were fired intentionally. *See Harris,* 354 S.C. at 389, 581 S.E.2d at 157 (finding defendant not entitled to involuntary manslaughter charge when he intentionally fired

warning shots in the victim's direction); *Cooney,* 320 S.C. at 112, 463 S.E.2d at 600 (finding no evidence to support involuntary manslaughter when defendant "admitted shooting the gun towards the ground at the victim's feet"); *Bozeman,* 307 S.C. at 177, 414 S.E.2d at 147 (citing *State v. Craig,* 267 S.C. 262, 227 S.E.2d 306 (1976), for the contention that an involuntary manslaughter charge is unwarranted "when the defendant admitted intentionally firing the gun, but claimed he only meant to shoot over the victim's head").

Sullivan cites several cases in support of his position. In each of these cases, however, there was evidence the defendant fired the gun unintentionally. *See State v. Brayboy,* 387 S.C. 174, 178, 182, 691 S.E.2d 482, 484, 486 (2010) (holding involuntary manslaughter charge appropriate when defendant claimed gun "just went off"); *State v. Light,* 378 S.C. 641, 644–46, 649, 664 S.E.2d 465, 466–67, 469 (2008) (holding involuntary manslaughter charge warranted when gun "went off" immediately after defendant "jerked it away from [the victim]"); *State v. Crosby,* 355 S.C. 47, 52–53, 584 S.E.2d 110, 112–13 (2003) (holding defendant's statement that he "didn't even know he pulled the trigger" was sufficient to warrant an involuntary manslaughter charge); *Burriss,* 334 S.C. at 263, 265, 513 S.E.2d at 108, 109 (holding involuntary manslaughter charge appropriate where gun "went off" and defendant claimed "[i]t was an accident").

### III. Conclusion

Because there was no evidence Sullivan fired the gun unintentionally, he was not entitled to a jury charge on involuntary manslaughter. Therefore, he was not prejudiced by trial counsel's omission of the *Burriss* language from his written request to charge. Thus, the ruling of the PCR court is **AFFIRMED.**

PIEPER and KONDUROS, JJ., concur.